**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-00231-APG-NJK |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| BRANDON CASUTT, | [Docket No. 48] |
| Defendant. | |

This matter was referred to the undersigned Magistrate Judge on Defendant Brandon Casutt's motion to suppress evidence. Docket No. 48; *see also* Docket No. 54 (errata to motion to suppress). The Court has considered Defendant's motion and exhibits, the United States' response and exhibits, Defendant's reply, the evidence and arguments presented at an evidentiary hearing held before the Court, and the parties' supplemental briefs. Docket Nos. 48, 49, 51, 54, 57, 58, 59, 60, 66, 67, 68.

**I.   BACKGROUND**

On August 21, 2020, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service, Criminal Investigations Unit ("IRS"), and the Henderson Police Department executed a lawfully-issued search warrant on Defendant's residence. Docket No. 66 at 8-10. Law enforcement officers gathered outside of the residence just before 7:50 a.m., then IRS agents knocked on the front door and loudly announced their presence. Docket 66 at 11-13. Defendant answered the door and the entry team entered the residence. *Id.* at 12, 18. The members of the entry team had their weapons drawn, which is their standard practice for the initial entry into a

1  location to execute a search warrant. *Id.* at 13. Defendant was told to remain on the front porch
2  and did so. Gov't's Exhibit 1 at 2:50-4:27. During this time, Defendant was briefly restrained so
3  that an officer could pat him down for safety. *Id.* at 3:36-4:26. The entry team members loudly
4  indicated their presence in the house to execute a search warrant. Docket No. 66 at 68-69. Within
5  two minutes of the knock and announce, Defendant's wife and teen daughter exited the residence
6  onto the front porch as well. *Id.* at 13. On the porch, several officers explained the COVID-19
7  search protocols to Defendant and his family – the video shows that everyone on the porch was
8  calm and that the tone was conversational. *See* Gov't's Exhibit 2 at 1:00-1:16. After the initial
9  entry, the officers holstered their weapons and Defendant, his wife, and his daughter remained
10 unrestrained. Docket No. 66 at 14.

11     While Defendant was on the porch, FBI Special Agent ("SA") Tom Lydiksen approached
12 him and introduced himself. *Id.* at 17, Gov't's Exhibit 2 at 1:47-1:59. IRS SA Kirk Miller also
13 introduced himself to Defendant. Gov'ts Exhibit 2 at 3:21-3:30. SA Lydiksen asked Defendant if
14 he would be willing to answer some questions and Defendant agreed. Docket No. 66 at 17, Gov't's
15 Exhibit 2 at 1:47-1:59. SA Lydiksen offered to have another law enforcement agent retrieve a
16 shirt for Defendant, in order to make him more comfortable, as he was wearing undergarments.
17 *Id.* at 18, 34. Since Defendant agreed to talk to them, SAs Lydiksen and Miller brought Defendant
18 into the house to interview him at the family's kitchen table. *Id.* at 18-19.

19     During the walk into the house, before the questioning began, IRS SA Richard Robinson
20 approached Defendant to give him the shirt that SA Robinson had retrieved from Defendant's
21 bedroom. *Id.* at 34, 42. SA Robinson was the lead computer investigative specialist tasked with
22 gathering the forensic data from the electronics on scene. *Id.* at 41-43. SA Robinson told
23 Defendant that, although he was not required to provide the passcodes to his electronic devices,

the search might be completed faster if he identified which devices in the house belonged to him and provided their passcodes. *Id.* at 42-43. SA Robinson did not provide *Miranda* warnings to Defendant prior to this statement because he "didn't think it was necessary." *Id.* at 43-44, 60. SA Robinson asked Defendant for the passcodes at this moment because he knew from experience that it might not be easy to get access to Defendant to ask for the passcodes once his interview with SAs Lydiksen and Miller began. *Id.* Asking for passcodes in this manner was SA Robinson's standard protocol during the execution of search warrants. *Id.* at 55.

Defendant told SA Robinson that a red iPhone with a black case in his bedroom was his and provided the passcode, which SA Robinson wrote down. *Id.* at 44. SA Robinson underwent similar interactions with Defendant's wife and daughter. *Id.* at 46-47, 80. After talking with Defendant, SA Robinson went upstairs, located the iPhone, unlocked it, and placed it in airplane mode before extracting the data. *Id.* at 45. While looking for the iPhone, SA Robinson located an iPad on the bed, which Defendant's wife identified as belonging to Defendant. *Id.* at 45-46.

After his interaction with SA Robinson, Defendant went into his kitchen with SA Lydiksen. *Id.* at 19. SA Lydiksen sat with Defendant at the kitchen table and made small talk with him while they waited for SA Miller to arrive. *Id.* at 21-22. No substantive discussion or questioning occurred prior to the arrival of SA Miller. *Id.* at 22.

Once SA Miller arrived in the kitchen, the interview began. *Id.* at 21-22. *See also* Docket No. 49, Exhibit B. SA Miller informed Defendant that the agents had a warrant for his arrest and that he would be arrested that day. Docket No. 66 at 22-23. SA Miller provided oral *Miranda* warnings to Defendant, as well as a paper copy of the *Miranda* warnings on a waiver of rights form. *Id.* at 23-24. Agent Miller read from the paper form before providing it to Defendant and

gave Defendant the opportunity to read the form when it was provided to him. *Id.* at 23-25. The only question Defendant asked was about why he was under arrest. *Id.* at 25.

At 8:07 a.m., Defendant signed the written waiver of rights form, as did SAs Lydiksen and Miller. Docket No. 48-3 at 2. The agents proceeded to interview Defendant for approximately three hours. Docket No. 66 at 26. Throughout this interview, the other officers present at the house continued to execute the search warrant. *Id.* at 34-35. For at least part of this interview, Defendant's wife and daughter were located in the living room, where they could likely hear the ongoing interview. *Id.* During his interview, the agents informed Defendant about the bases for his arrest. *Id.* at 25. Defendant made no request to stop the interview in any way throughout the questioning. *Id.* at 26. SA Robinson interrupted the interview one time to ask Defendant for his iPad passcode. *Id.* at 54. Defendant was not re-*Mirandized* before this questioning and he was not told he did not have to provide the passcode for his iPad. *Id.* at 46, 60. Immediately following the interview, Defendantt was transported to the Henderson Detention Center for COVID-19 screening. *Id.* at 26. He was then taken into the custody of the United States Marshal Service. *Id.* at 27.

SA Robinson testified that having the passcodes allowed him to process the devices on site, rather than having to seize the devices and take them off-site to use programs to bypass the device's passcode. *Id.* at 49. He testified that data extraction can be the most time-consuming aspect of executing a search warrant and that, when he has the passcode, he can often leave the devices at the residence after the execution of the search warrant. *Id.* at 49, 63-64. SA Robinson conducted forensic previews on site to narrow which devices needed to be seized. *Id.* at 43. SA Robinson testified that the technology used to bypass passcodes to collect data can damage or destroy the integrity of the data stored on the device, can take days or months or even longer, and can

ultimately prove unsuccessful at extracting data. *Id.* at 56-59. At the time the search warrant was executed on Defendant's residence, SA Robinson had never had to use any of these other methods for data extraction. *Id.* at 57.

During the execution of the search warrant, SA Robinson extracted the data from Defendant's iPhone and iPad and, therefore, left the devices at the home when he left. *Id.* at 49. SA Robinson understood the search warrant allowed him to make a duplicate copy of all the data on a device as part of the extraction. *Id.* at 54. No parameters were set for the extraction and Agent Robinson made a complete copy of the data on each device. *Id.* at 59.

## II.     ANALYSIS

### A.     Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds that the law enforcement witnesses testified credibly.[1]

**B.     Motion to Suppress**

Defendant asks the Court to suppress three categories of evidence collected during the execution of the search warrant at his residence. Docket No. 54-1 at 5. First, Defendant seeks the suppression of the passcodes to his electronic devices that were acquired by SA Robinson. *Id.* at 5-9. Second, Defendant seeks suppression of any evidence collected from the devices using those passcodes, as well as the fruits of any evidence therein. *Id.* Third, Defendant seeks suppression of all statements he made to law enforcement during the three-hour interview conducted at his home while the search warrant was being executed. *Id.* at 9-16.

Defendant submits that SA Robinson's request for his device passcodes constitutes custodial interrogation. *Id.* at 6-9. Defendant submits that, therefore, he should have been given *Miranda* warnings prior to the request for his passcodes. *Id.* at 9. Defendant submits that, since multiple agents were present with weapons and an arrest warrant for him, he was clearly in custody. *Id*. at 6. Defendant further submits that asking for the passcodes constitutes interrogation because it was an act that compelled him to recall from memory the passcodes to his devices, which would be used to "extort[]" the information contained on the devices. *Id.* at 7-9.

---

[1]     Defendant's daughter testified as the sole defense witness. As the Court found her testimony less than credible, the Court does not rely on it in any way in this Report and Recommendation.

Defendant submits that SA Robinson should have given him *Miranda* warnings prior to asking for the passcode for his iPhone because it was a compelled testimonial communication akin to an implied assertion of fact that the device, and that to elicit this information without warnings violated the Fifth Amendment. *Id.* at 9. Defendant further submits that the agents engaged in an illegal two-step protocol in violation of his *Miranda* rights, that his waiver was involuntary under the totality of the circumstances, and that his iPad passcode was obtained in violation of the Fifth Amendment. *Id.* at 9-15. Defendant submits that asking for the passcodes to his electronic devices exceeded the scope of the search warrant in violation of the Fourth Amendment. *Id.* at 15-16. Finally, in his supplemental briefing, Defendant submits that SA Robinson exceeded the scope of the consented search by copying the entirety of the data on his devices rather than the limited data and information expressly covered by the terms of the search warrant, in violation of the Fourth Amendment. Docket No. 68 at 13.

In response, the United States submits that no Fifth Amendment violation occurred because Defendant voluntarily provided his passcodes to SA Robinson in a situation where *Miranda* warnings were not required. Docket No. 58 at 9-14. The United States further submits that, even if *Miranda* warnings were required, Defendant's statement was voluntarily made; therefore, the derivative use of the obtained passcodes to access the information was appropriate. *Id*. The United States submits that no impermissible two-step interrogation occurred, and that Defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. *Id.* at 15-24. Further, the United States submits that asking Defendant for the passcodes did not exceed the scope of the search warrant. *Id.* at 14-15. Finally, in its supplement, the United States submits that any arguments as to the extent of the data extraction covered lawfully by the warrant should not be considered as they were not briefed before the Court, and that, in any event, the warrant permitted a complete

data extraction on-site to allow law enforcement to make later, off-site determinations about what data properly fell within the scope of the warrant. Docket No. 67 at 12, n.6.

### 1. *Miranda* Standards

Law enforcement personnel who wish to question individuals in their custody must first afford them certain procedural rights. The most salient of these rights are the so-called "*Miranda* warnings" – prior to questioning, an officer must tell a suspect "that he has the right to remain silent and also the right to the presence of an attorney." *Robertson v. Pichon*, 849 F.3d 1173, 1183 (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). These warnings are designed to protect a person's Fifth Amendment privilege against compelled self-incrimination. The Supreme Court has reasoned that the privilege is protected when a person is adequately and effectively advised of his rights. *See id.*; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

*Miranda* warnings are only required when the person being questioned is subjected to custodial interrogation. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). The Court examines the totality of the circumstances when determining whether an individual was in custody. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 121, 1235 (9th Cir. 1981)). This requires the Court to assess the objective circumstances of the

interrogation. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The subjective views of either the suspect or the interrogating officer is not relevant to the custody determination. *Id.* The Ninth Circuit has identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

*Miranda* warnings function both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Williams*, 435 F.3d at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Id.* at 1152. In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Interrogation under *Miranda* consists of any words or actions on the part of law enforcement officers that the officer "should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Williams*, 842 F.3d 1143, 1146-47 (9th Cir. 2016). Generally, questions about routine background biological information such as identity or age do not constitute interrogation. *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (citing *United States v. Perez*, 776 F.2d 799 (9th Cir. 1985)). *See also Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Whether words or actions are likely to elicit an incriminating response is determined primarily by looking to the perceptions of the suspect being questioned. *Id.* at 600-01

9

(citing *Illinois v. Perkins*, 496 U.S. 292 (1990)). However, the Court can consider "any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion" to determine what the police should have known when acting or speaking. *Rhode Island v. Innis*, 446 U.S. 291, 302 n. 8 (1980).

Here, the Court finds that, under the *Kim* factors, Defendant was not in custody when SA Robinson first asked him to provide his passcodes. Defendant was standing, unrestrained, in his living room and was not summoned to that location by SA Robinson. Although agents had a warrant for Defendant's arrest, he was not formally under arrest at that juncture and was not even aware of the warrant at the time.[2] Defendant was told that the other agents hoped to talk with him and but was not confronted with any other evidence of guilt. Further, Defendant only spoke with SA Robinson for a few moments, which amounted to the time necessary for SA Robinson to hand Defendant his shirt, inquire whether Defendant would be willing to provide his passcodes, and advise him that he was not required to do so. While SA Robinson did tell Defendant that he might have his devices back sooner if he provided the passcode at that time, nothing suggests that any

---

[2] At the evidentiary hearing, the parties paid significant attention to the fact that agents had an arrest warrant for Defendant at the time of this interaction. *See, e.g,* Docket No. 66 at 27, 53. Although Defendant was later arrested, "[w]hether an arrest has occurred depends on an objective … evaluation of what a person innocent of a crime would have thought of the situation, given all the factors involved." *See United States v, Johnson*, 626 F.2d 753, 755 (9th Cir. 1980). "Primary among these is a determination of whether or not the defendant was free to choose between terminating or continuing the encounter with law enforcement . . . ." *Id.* Here, the facts indicate that Defendant was not under arrest at this juncture. The only thing Defendant had been asked at the time was whether he would be willing to interview with agents. Further, though agents were executing a search warrant at the house, no facts provided to the Court indicate that Defendant felt that he had no choice whether to talk with the agents. Nothing suggests inappropriate force or coercion was used to detain Defendant or require him to participate in this interview. A reasonable, innocent individual in this situation would have felt free to end the encounter with law enforcement. Accordingly, the Court finds that Defendant was not under arrest during this encounter.

unnecessary or unreasonable pressure was applied to keep Defendant in the interaction or to compel him to provide his passcode. The Court finds that a reasonable person, under these circumstances, would feel free to leave the interaction and, therefore, the Court finds that Defendant was not in custody.[3]

Based on the totality of the circumstances, the Court finds that Defendant was not subjected to custodial interrogation when SA Robinson asked him for the passcode to his devices. Therefore, the Court finds that Defendant's passcodes were not improperly obtained.[4]

### 2. *Miranda* Waivers

The constitutionally mandated protections communicated by *Miranda* warnings can be waived. Waivers of the rights communicated by *Miranda* warnings must be voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 444. No formalistic waiver procedure exists that must be followed for the waiver to be effective. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Whether a suspect has waived his *Miranda* rights is determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *Id.* at 373. Whether a suspect is aware of the potential subjects of questioning in an

---

[3] As the Court has found that Defendant was not in custody when he spoke with SA Robinson and provided the passcode to his iPhone, the Court need not determine whether the questions constituted interrogation.

[4] When SA Robinson asked Defendant for the passcode to his iPad, Defendant had already been given his *Miranda* warnings and had agreed to speak with agents. Considering the totality of the circumstances, the Court finds that Defendant's response to this question was voluntary as well.

11

interrogation is irrelevant to the analysis of whether a waiver was knowing, intelligent, and voluntary. *Colorado v. Spring*, 479 U.D. 564, 577 (1987). The government bears the burden of establishing waiver by a preponderance of the evidence. *Berghuis*, 560 U.S. at 384.

Here, the Court finds that Defendant's waiver prior to his interview with SAs Ludiksen and Miller was voluntary, knowing, and intelligent. The United States clearly established that Defendant was verbally advised of his right to remain silent, that any statements he gave might be used against him, his right to have counsel present, and his right to appointed counsel during the interview if he could not afford counsel but desired to have counsel present. He was also told that, once the interview had started, he would be free to end the interview at any time. Defendant was provided with a written copy of the *Miranda* warnings and was both encouraged to reread them and given time to do so. He was also given the opportunity to ask questions before signing the waiver form. Defendant asked about the contents of the arrest warrant but had no questions about the rights covered in the *Miranda* warnings. Neither SA Miller nor SA Lydiksen pressured Defendant to sign the waiver form. Additionally, Defendant voluntarily signed the waiver form provided to him. Defendant's tone throughout the interview demonstrates that he was not emotional or distraught at the time he waived his *Miranda* rights. *See* Docket No. 59, Exhibit B. Further, Defendant never asked to end the interview or for any other break throughout the questioning. No evidence was provided to the Court that Defendant holds other personal characteristics or was under the influence of any substance or condition which might have impaired his ability to freely decide whether to waive his *Miranda* rights for the purposes of his interview with SAs Miller and Lydiksen. The Court finds that the United States has met its burden of establishing that Defendant's *Miranda* waiver was knowing, intelligent, and voluntary.

### 3. Two-step Interrogation

A two-step interrogation "involves eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of *Miranda* rights, and then eliciting a repeated confession." *United States v. Narvaez-Gomez*, 489 F.3d 970, 973-74 (9th Cir. 2007). These protections only apply if the protections of *Miranda* should have been afforded for the first interaction with law enforcement. "[W]here law enforcement officers deliberately employ a two-step interrogation to obtain a confession and whether separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his rights, the trial court should suppress the confession." *Williams*, 435 F.3d at 1158 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)) (emphasis removed).

In *Seibert*, the Court found that midstream *Miranda* warnings have inherent issues. For example, "telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." *Seibert*, 542 U.S. at 613. Thus, the Court found, "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 613-14 (citing *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). The Court further found that "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle. *Id.* at 614.

The Court has already found that Defendant's interaction with SA Robinson was not custodial and that *Miranda* warnings were not necessary during that interaction. Therefore, the Court finds that no two-step interrogation occurred.

### 4. Scope of the Search Warrant

Officers executing a search warrant are generally confined to the bounds set by the warrant. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971). Whether a search exceeds the scope of the warrant is determined by objectively assessing the circumstances surrounding the issuance of the warrant, the contents of the search, and the circumstances of the search. *United States v. Hitchcock*, 286 F.3d. 1064, 1071 (9th Cir. 2002), *as amended*, 283 F.3d 1021 (9th Cir. 2002). The exclusionary rule generally bars admission of evidence seized that falls outside of the scope of the warrant. *United States v. Sedaghaty*, 728 F.3d 885, 915 (9th Cir. 2013) (citing *United States v. Payton*, 573 F.3d 859, 864 (9th Cir. 2009)).

Defendant submits that the agents exceeded the scope of the warrant by compelling him to provide his passcode. Docket No. 54-1 at 15-16. The Court has already determined that Defendant voluntarily provided both of his passcodes to agents and that agents did not compel him to do so. Further, in looking at the totality of the circumstances, the Court finds that the data collection in this case fell within the scope of the search warrant. The warrant authorized a broad range of types of data, including data and information that could be used to both identify the owner of the device and his state of mind related to the underlying offenses being prosecuted in this case. The warrant allowed for the seizure of the data on-site and for later review of the data to locate the items authorized by the search warrant. The necessary protocols to utilize for the forensic review were left to the discretion of the officers executing the warrant. SA Robinson obtained the devices,

extracted the data, and left the devices at the residence. He therefore acted within the scope of the warrant.

Because the totality of the circumstances indicate that SA Robinson was acting within the scope of the warrant when he asked Defendant for his device passwords and that Defendant voluntarily provided them, suppression is not warranted on this basis.

### 5. Scope of the Data Extraction

The parties first addressed arguments about the scope of the data extraction in their supplemental briefing.[5] *See* Docket Nos. 67, 68. This issue has not been fully briefed and is not properly before the Court.

## III.   RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 48, be **DENIED**.

DATED: January 18, 2022.

NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). A party who objects to this report and

---

[5] Defendant attempted to raise this issue at the evidentiary hearing. Docket No. 66 at 6. The Court cautioned Defendant at that time that the Court would not consider new arguments that had not already been briefed by the parties. *Id.* at 6, 83.

recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).